Johnson, Ch.
delivered a dissenting opinion, which had not been filed when it was necessary to send this volume to the press, and is therefore most reluctantly omitted.
O’Neall, Evans and Butler, JJ., concurred with Johnson, Ch.
J. Johnston, Ch. and Wardlaw, J. concurred with Richardson. J., Harper, Ch. and Dunkin, Ch.
Judgment reversed.
*537 IN THE COURT OF ERRORS, AT COLUMBIA, MAY, 1843.

The State vs. The Bank of South Carolina.

OPINION OP CHANCELLOR JOHNSON.
The leading questions involved in this cause, and those to which alone I shall address myself, are of much importance in themselves. They are, in some degree, novel, and it cannot be disguised that they have derived additional interest from the political considerations which have been brought into the discussion of them. The world are not yet agreed whether chartered banking institutions, with the power'to issue bills, are or are not a blessing or a curse; and there is, perhaps, as much, or more, diversity of opinion as to the limitations and restrictions that ought to be imposed upon them. With these considerations, happily, the court has no concern. They belong exclusively to the legislative department of the government, and, divested of them, the questions which I propose to consider, depend on plain and well defined principles of law — principles founded on common sense and common honesty, and of universal application. I mean those by which contracts are interpreted, .and by which the parties are required to fulfil them in good faith, and nothing more.
For the purpose of arriving directly at the principal matters of controversy, I propose to concede, 1st, that the bank is a private corporation ; 2d, that the charter, (the Act of incorporation,) confers on it certain privileges or franchises, which may be forfeited for non-use or abuse; 3d, that the proceeding (sci. fa.) is the proper mode of trying the question of forfeiture; and following the example of the circuit court, I shall avoid the technical questions raised as to the pleadings, and refer to them only so far as may be necessary to present the questions to be considered.
The charter has been generally treated in the argument, and I think properly, as a contract between the State and the bank; and to ascertain what that contract is, and whether it has or has not been broken, we must refer to the Act of incorporation, which called the corporation into being. In doing this, however, it will be necessary to refer only to such of the provisions as bear upon the question in hand.
The bank, as stated in the judgment of the circuit court, was first chartered in December, 1801, to continue until the 1st January, 1823. In 1815, the Legislature passed an Act amendatory of the charter, by which it was *538 authorized to deal in inland hills of exchange, a power not before granted or exercised. In December, 1822, the charter was renewed by Act of the Legislature, for the term of. 12 years, to he computed from the 31st of that month, with the right to enjoy all the powers, privileges, immunities and benefits, and subject to all the restrictions granted and imposed by the charter under which it then acted. The charter was again renewed by Act of the 20th December, 1832, for a period of twenty-one years, to be computed from the day on which its previous charter would expire, and it is under this Act that it now exercises banking powers; and by this Act it is “ permitted and authorized to exercise and enjoy all the privileges, rights, powers, immunities and benefits which it now exercises and enjoys under its charter, or which the Planter’s and Mechanic’s Bank, and the Union Bank of South Carolina, or either of them, now exercise, possess a id enjoy, under any Act of the General Assembly of this State now in force ;” and it is further provided, “ that the said Bank of South Carolina, for the charter so renewed and extended, shall, on the 2d day of January next after the expiration of its charter, pay into the treasury of the lower division of this State, a bonus of sixteen thousand eight hundred and seventy-five dollars; and it is further provided, that it shall and may he lawful for the hank to increase its capital to one million of dollars, paying an additional bonus. in proportion to such increase of capital.”
We are thus referred back to the previous charters of this Bank, and of the Planter’s and Mechanic’s and Union Banks, to ascertain what are the powers, privileges and immunities granted, and the restrictions imposed, by the Act last referred to.
I have looked into these Acts with some attention and care, and I have not been able to find that any express authority is given to the banks to make or issue bills or notes — but that is necessarily implied from many of their provisions — or that the notes or hills, when issued, shall bo regarded in the nature of a circulating medium. It is, however, declared, that the hills and notes issued by the bank, promising to pay money, “ shall he binding and obligatory on the said corporation, in like manner, and with the same force and effect, as upon any private person' or persons, if issued by him, her or them, in his, her or their natural capacities, and shall be assignable,” &c. 8 Stat. at Large, 21. They are expressly authorized to deal in bills of exchange and gold and silver bullion, and “ generally to do and execute all and singular such matters and things which to them may be thought necessary and proper for the good government and management” of the bank. Amongst other limitations and restrictions imposed on the bank, they are forbidden to receive a greater interest than six per cent, per annum, or at any time to incur debts to a greater amount than three times the amount *539 of their capital, “ exclusive of the monies actually deposited in the hank for safe keeping,” &c.
The breaches of this charter complained of in this proceeding, are, 1st, that while the said bank was transacting business, as aforesaid, and when the said bank had issued a large amount of bills, viz: $750,000, which were then outstanding and in circulation, as a part of the actual currency of the State; and when the said bank had also in deposit large sums of money, in all amounting to $350,000, on the 18th of May, 1837, the president and directors of the said bank resolved to suspend payment in gold and silver, the legal current coin pf the said State, as well of the bills issued and put in circulation by the said bank, as of the money received on deposit; and that from the said 18th ofMay, 1837, until the 13th of September, 1838, the said bank did actually refuse to 'pay, when demanded, in gold and silver, the bills issued by the said bank, and the monies deposited in the said bank; and during all that time continued to issue bills in the nature of a circulating medium, to receive money on deposit, and discount promissory notes. &c. 2d. That afterwards, on the 14th day of October, 1839, the said bank again suspended specie payments as it had done in 1837, and continued so to do until the 25th July, 1840, and during all that time continued to issue bills, •to lend money, and discount notes, as it had done during the previous suspension ; and it is charged that these acts were done “ to the great damage of the State, in violation of the trusts and conditions of the said Act of incorporation given and granted, as aforesaid, to the said Bank of South Carolina, in and by the last mentioned Act of the General Assembly, and to the utter perversion of the ends, objects and purposes for which the powers, authorities, liberties, privileges and franchises, aforesaid, were given ánd granted to the said Bank of South Carolina.”
And it may be observed here, once for all, that this declaration charges no new act to have been done or committed by the bank, which is not expressly authorized by the Act, except the suspension of specie payments ; nor is the act of suspension any where expressly prohibited or declared to be cause of forfeiture. But it is insisted that we must look beyond the charter itself, and inquire whether it is not a violation of some condition implied from the nature of the contract; and I agree that in this, as in all other contracts, all that is necessary to carry into effect the expressed intent of the parties may and must be implied. And if one employ a carpenter to build an house, the law implies an obligation on his part that he will do it in a faithful and workmanlike manner; or a smith to shoe his horse, he is bound to do it skilfully, although that is not expressed. In the language of Mr. Justice Washington, in Dartmouth College vs. Woodward, 4 Wheat. 658, in reference to private corporations, “ the obligation imposed on them, and *540 which forms the consideration of the grant, is that of acting up to the end or design for which they were created by their founder.”
What, then, was the end or design, of the Legislature in incorporating this bank ? It is no where expressly declared, but if we look into the powers granted, and the nature of the institution, we can hardly be mistaken in supposing that the advantages and conveniencies which would result to the community by the facility of obtaining loans of money, by the increase in the amount of the circulating medium, and by the greater facility in the transportation or remittance of'large sums of money, and the bonus paid for the charter, were benefits contemplated to be derived by the State. Nor can it be supposed that the Legislature contemplated no benefit to the bank. No set of men will be found to accept of such a charter, with all its hazards and responsibilities, from pure love of country. Neither the time nor the occasion called for so much disinterested patriotism. The bank expected, and the Legislature unquestionably intended, to confer on it the usual profits and e noluments arising from banking operations, and to this end conferred on it, in the language of the Act of 1801, the power “ generally to do and perform all and singular such acts, matters and things which to them shall or may appertain.” And if this grant means any thing, (and, according to the maxim, ut res mages valeat quam pereat, it must have some effect, if possible,) it conferred on the bank all the rights, powers and privileges necessary to carry on their business, according to the general usages of banks, in all respects, except in such particulars as were expressly provided, and subjected it to all the liabilities and restrictions imposed by the usage. To the usage, therefore, we must look for all the implied powers and liabilities of the bank,
Let us begin with the organization of a bank. The amount of the capital, as in this case, is usually limited by the Act of incorporation, and the stock is subscribed, and is paid for in specie, or whatever else the bank may regard as an equivalent, unless otherwise provided in the charter — sometimes in other stocks, of which $300,000 subscribed by the State to the State Bank, to be paid by a certificate of the Comptroller, bearing an interest at the rate of six per cent, per annum, will furnish an example. (See Stat. at Large, 8 vol. p. 12.) We know, too, that subscriptions for stock are, for the most part, paid in the bills of other specie paying hanks, which the officers of the bank undertake to convert into specie, as a convenience to the stockholder; that, government and other marketable stocks readily convertable into money, are frequently received in payment; and in some cases the bond or note of the stockholder, bearing interest, is accepted as a substitute. But in all these cases care is usually taken to require payments in specie, to suit the probable demands on the bank, If the whole amount *541 of the capital should be paid in specie, (a thing which has rarely or never occurred within the memory of man,) unless put into action, it would remain a useless and unproductive mass; and it is known, that to avoid this, it is usually invested in productive marketable securities, which may be made available at short notice; and we have it from high authority, that specie in the proportion of about one third or one fourth of the amount of the circulation, is ordinarily sufficient to meet the current demands, the bank depending on the proceeds of notes and bills of exchange, payable at maturity, and daily falling due, to meet any extraordinary emergency. Such is a general internal view of the banking institutions o'f this State; and for the purpose of meeting the question fairly, it may be conceded that generally the bank was bound to redeem its notes in specie, when demanded.
By the terms of the charter, the Bank was authorized to incur debts and issue bills to three times the amount of its charter; and can it be supposed, that the Legislature, with a knowledge that the capital of the Bank was to be made up and employed in the manner before stated, expected that it would or could be, at all times, prepared to meet all the demands that might, under all circumstances, be made upon it? — and contend that the failure to do so, should operate as a forfeiture of their charter.
Banks are created, born, with the elements of suspension in them, which the slightest circumstances may call into action. No Bank would accept a charter for the privilege of issuing bills to the precise amount of the specie in its vaults, at a lower rate of interest than is allowed by law for the loan of money by an individual, diminished still more by the expenses of Banking operations; and to make any profit at all, (and be it remembered that that is one of the ends of its incorporation,) it must take the hazard of being unable, at all times, to meet the demands upon it. Combinations of other banking institutions or private individuals, or a panic, might almost at any time force them to suspend. As appropriate to this subject, I remember to have somewhere seen an anecdote in relation to one of the private Banks in England. A horse having taken fright, ran away with a carriage, and dashed it to pieces against the Banking-house — a facetious observer said of it afterwerds, “that there had been a run upon the Bank.” The bill holders took the alarm, and rushed upon the Bank, with a fury little short of the late Cincinnati mob. Explanations were vain, they would hear none. And when the excitability of the human passions in relation to pecuniary matters are remembered, such a case might well have, occurred.
But let us examine the veritable, actual history of Banks, in reference to the necessity of the suspension of specie payments, at the time this Bank was first incorporated in 1801. The Bank of England, perhaps the most magnificent institution of f jie kind in the world, was in a state of suspension, *542 and Alison, in his history of Europe, now publishing in numbers, (see the 3d No. p. 405,) says that “ the consequences, whether for good or for evil, were not attributable to Mr. Pitt, the prime minister,'but. they were forced on him by stern necessity. Bankruptcy, irretrieveable national bankruptcy, stared him in the face, if the momentous step were any longer delayed and it is universally agreed, that whatever evils might have resulted from the measure, it enabled Great Britain, and furnished her with resources, to sustain the most expensive, sanguinary, and protracted war to be found in the annals of the world. But it is said that this suspension was authorized by the Privy Counsel, and therefore justifiable. That is true, but I know of no higher authority to show that suspensions'are sometimes less injurious to the public interest, than the exhaustion of all the resources of the Bank by continuing to pay specie. Let us come nearer home for an example. Who has forgotten that in 1812 every Bank in the United States suspended specie payments, and did not resume until 1817, after the termination of the late war with Great Britain, and that the army and navy were paid.and subsisted by the bills of these non-paying specie Banks? Andean we forget that the Southern Army were paid and subsisted by the bills of our own Banks, to which, although I do not know the fact, this Bank, the Bank of South Carolina, in all probability, contributed its due proportion? And why was all this? Simply because.the supply of specie was unequal to the demand, and if every dollar had been drawn out of the Banks, the public interest would not have been subserved, though the Banks would have been ruined. No one ever heard this, complained of as a violation of their charters, either judicially or otherwise. On the contrary, the Legislature, by the Act of 1815, passed during this suspension, conferred on this very Bank greater powers than she had before exercised, that of dealing in Inland Bills of Exchange. It may be said, that this was a great public emergency, which justified the Act, arid certainly it was justified in public opinion. But arc the public concerned in nothing else but the payment and subsistance of its army and navy? Are not the interests of commerce, in a degree, equally the objects of the care and attention of the Legislature ? And may not emergencies arise out of them which would impose on the Banks the like necessity of suspending specie payment? The Legislature, at the time of granting this charter, knew that the Bank was to be organized and conducted in the manner, and would be exposed to^the perils, before stated, and that even the public interest, as in’ the case of the Bank of England, might require it to suspend, and it cannot be supposed that a forfeiture for that cause would have been left to implication. So much for the past. Let us now look to the suspension of specie payments in 1837, which extended to all the Banks in the United States, except those of Massachusetts. This i¡=¡ recent history, and we all know, without reference to the chronicles of the *543 day, that this was forced upon the Banks by the extraordinary demands for specie for exportation abroad, and the Banks had no alternative but to suspend, or to suffer all the specie to be carried out of the country, leaving them powerless, bankrupt, and the country from Maine to Louisiana and the Rocky Mountains, probably without a ■ dollar of the precious metals; and throughout that whole extent, not a murmer of complaint is heard against any one of the Banks, and no one, then or now, believes that payment in specie, by this Bank, or any of the Banks of this State, would have promoted their own interests or subserved the public benefit or convenience. Let us hear what we, the people of this State, through our representatives, have said of it. In his message to the Legislature, at the commencement of the Session, in November, 1837, and when all the Banks were in a state of suspension, and remained so until September following, Governor Butler brings to their view the fact of suspension, and exhibits a statement of their actual condition, obtained from materials furnished by them. That portion of the message, and it seems a resolution of the Legislature, which I have not been able to obtain, declaring their confidence in the soundness of their banking institutions, were referred to the committee of Ways and Means, of which one of the counsel for the State in this cause, (Mr. Memminger) was the Chairman, and the following is their report.
“ The Committee of Ways and Means, to which was referred so much of the Governor’s Message as relates to the conditon of the Banks of our State, and the Resolution of the House, declaring our confidence in our banking institutions, beg leave to report: — That they have examined the condition and exposition of the Banks accompanying the Message, and feel satisfied that they are entitled to the public confidence.”
Does this look like the State intended that a condition was implied in the charter, that suspension should be a cause of forfeiture 1 Again, by the Act incorporating the Commercial Bank of Columbia, the bills of that Bank are made receivable for taxes and all other public dues, as long as they continue to redeem them in specie; but provides, that if they suffered any of their bills to be protested, the Comptroller should prohibit their receipt, “unless good and satisfactory cause should be shewn him by the said corporation, for protesting in a court of justice the payment thereof.” Contemplating, evidently, the possibility and necessity of suspending payments.
Lending and putting in circulation her bills during the time of suspension, thus, as it is said, increasing the evils incident to it, is charged upon the Bank as a violation of its charter. That charge is, I think, fully met in the Circuit Court opinion. But the truth will, perhaps, afford the best commentary. The Banks, although they had suspended specie payments, retained the confidence of the community, and that confidence has been *544 fully realized. Their bills were sought after with avidity. There were, in fact, no others in circulation, nor was there any specie which could be made available in the country. The specie paying Banks never suffered one of their own bills which came into their possession, to pass their portals, and the fact is well known that the whole crop of 1839 was purchased and paid for in the bills of the suspended Banks. They -were received without hesitation, at par, in the payment of all debts and contracts, and if it were put to the community to decide, I do not hesitate to say, that they would pronounce, with the exception, perhaps, of those who entertain prejudices against Banks, that the suspension was a general benefit. Say that depreciation in the value of their bills was the inevitable consequence of suspension — The planter was indemnified in the sale of his produce, and the merchant in the sale of his wares. The Bank had no power to force their bills into circulation, and if individuals thought proper to make rags, shin-plasters, kites, or coon-skins, the measure of value, the State has no concern tin it — nay, cannot counteract it. The value of Bank paper always has been and always will be, subject to fluctuation; and even the precious metals are not exempt from the general consequences of a redundant or inadequate supply.
So much for our domestic materials; we will now look abroad and see what we can glean by the way side.
The question, whether the suspension of specie payment by a Bank, was a cause of forfeiture, came directly up in the case of the State of Alabama vs. Tombigbee Bank, 2 Stewart’s Rep. 30, referred to in the judgment of the Circuit Court, and it was held to be no cause of forfeiture. It arose incidentally in Pennsylvania, in the case of the Commonwealth vs. The United States Bank, which will be found in Appendix C, to the Brief in this cause. Mr. Justice King, the President of the Court of Common Pleas, delivered the opinion of the Court, and in remarking on this question, 'which seems to have been freely discussed in the argument, he says, “No one could assert, as a general doctrine, that the non-payment of a debt by a corporation to its creditor, was such a misuser of its franchises as would induce a forfeiture of its charter.” In the case of The People vs. The Washington and Warren Bank, 6 Cowen, 216-7, the question came before the Supreme Court of New York, and the language of Wood-worth, Justice, who delivered the judgment of the Court, appears to me entirely appropriate. “ I cannot,” says he, “assent to the proposition that insolvency merely, at a particular time, however produced, is good cause for dissolving the corporation. Its continuance must be such as to afford substantial ground to consider the object for which the institution was created, as defeated.” Again — “ The refusal to pay, unless arising from continued insolvency, is, in my apprehension, no ground of forfeiture. The *545 remedy of the creditor would seem to be by action. As to suspending operations, that may, in some cases, be a prudent and justifiable measure, and consistent with ultimate solvency.” And he might have added, with the interest of the Bank and the community; and all the researches of the counsel have not been able to rake up, from the rubbish of ages, a single case or dictum, controverting the correctness of this doctrine.
There is a principle running through these cases, whici, although so commonplace as to be often overlooked, pervades every contract, and is of Universal application. Parties may make any contract they think fit, if the .subject contracted about is in itself lawful; and if the party bound, do that which it requires of him, or forbears to do that which it forbids, in good faith, and loss or injury happen to the other party, it is damnum absque injuria.
I have before stated, that the declaration does not charge the Bank with any act prohibited by the charter, or the omission to do any act expressly enjoined by it. Nor is there any allegation that the affairs of the Bank were not conducted in perfect good faith. I have shewn, I think, conclusively, that although the Bank was bound, generally, to redeem her bills in specie, it was not expected that she should do so under all circumstances, because it was impossible, and that suspension was forced upon her by circumstances which she could not controul. If loss has happened to the State, it is damnum absque injuria.
But why refer to authorities ? Why reason about this matter? The specie of all the world would probably not be sufficient to redeem all the Bank paper now in circulation in the United States; and although it might be proved by a deduction, as conclusive as a mathematical conclusion, that the Banks ought to pay all their liabilities in specie when demanded, the fact stares us in the face, and we cannot shut our eyes upon it, that the thing is impossible.
The suspension of 1837 is one of the causes of forfeiture charged in this declaration, but I did not understand that it was intended to be particularly relied on, and I cannot suppose that it was thought to be tenable. The Legislature, one of the contracting parties under whose authority this proceeding was instituted, has declared that the Bank, notwithstanding this suspension, was entitled to the “public confidence,” a concession necessarily implying that its affairs had been conducted with propriety — and it is notorious, that the whole community admitted the necessity and approved the; suspension.
The suspension of 1839 is, it seems, the gravamen of this prosecution. That differs from the former, principally in the circumstance that it continued only about half the time. The circumstances under which it occurred, were also somewhat different. In the first, all the Banks in the Uni *546 ted. States, except those of Massachusetts, had suspended. In the last only the Banks in Philadelphia and Baltimore, in Virginia and North Carolina, and South and West of Charleston, and the Planters’s and Mechanic’s Bank, the Union Bank, the State Bank, and the Rail Road Bank of Charleston, had suspended ; the Bank of the State of South Carolina and the Bank of Charleston, only, continuing to pay specie; and an argument against the necessity for suspension, has been drawn from the circumstance, that the two Banks last named, continued to redeem their paper. But that cannot bear the test of examination, The pressure on two Banks, haying incurred liabilities to thp same amount, with the same means, may be very unequal, as in the case of a,ran upon one of them, originating either in convenience, caprice, or a combination against it. And the operations of one may go on smoothly and safely, and the other may be drained of all its immediate resources, although equally solvent. In illustration of this, I trust I will be pardoned for stating a fact, derived from the President of the Commercial Bank of Columbia, which had not suspended specie payments. The Bank of the State of South Carolina, as before remarked, continued to redeem her bills in specie, and yet, at the time, the Commercial Bank had in its possession an amount of the bills of the former Bank, equal, at least, to fifty per cent, over and above all the specie which she had in her vaults, as ascertained by the Report of her President, and if this amount had been pressed | upon her, she, too, would, in all probability, have been forced into suspension, but it was forborne in the spirit of courtesy.
Having established, as I think, satisfactorily, that the bare suspension of specie payments is not a ground of forfeiture, it follows, necessarily, that it was incumbent on the State to charge and prove some fact which would have amounted to a forfeiture, as the non-use or abuse of its franchises; the neglect to exercise them, in the language oí Judge Woodworth, for so long a time as would “afford a substantial ground to consider the object for which the institution was created, as defeated or some abuse of its powers for unworthy or fraudulent purposes, by which loss or injury was sustained by the community, as the suspension of specie payments when the bank had the means of paying, and without necessity; resorting to means to depreciate its own paper, and purchasing it at a discount; putling paper into circulation without providing the ordinary means to redeem it; or any other dishonest or fraudulent practices.
If I am wrong in this, the fifth plea, which has been characterized as rigmarole, contains, notwithstanding, in my judgment, the material of a perfect justification. The declaration, it will be remembered, does not charge any deceitful, dishonest or fraudulent practices against the bank. This plea states, that in consequence of the suspension of the banks in Baltimore, *547 Philadelphia, Virginia and North Carolina, of the banks south and west of Charleston, and of a portion of the banks in Charleston, and the demands for specie being extraordinary and irregular, “ the said bank was unable to <pay its clues and liabilities in gold and silver coin" and that she resumed as soon after as her means enabled her to do so, with safety to her own interest and the interests of the community. The fact that she was forced into suspension by circumstances which she could not control, without fault or blame on her part, is her justification.
It is said that this is mere matter of excuse. The line which separates excuse and justification never has been and never can be defined. The extremes are palpable enough, but the point at which they meet invisible, intangible. Take the cases of murder and manslaughter as an example. If one kill another of malice prepense, indicated by his laying in wait, that is murder ; but if he kill him in sudden heat and passion, on reasonable provocation, it is clearly manslaughter. But what precise state of facts will or will not amount to reasonable provocation, cannot be ascertained by any rule ; and the only means heretofore devised for solving the difficulty, is the trial by jury. So here, if the defence does not, as I suppose, amount to a perfect justification, as matters of excúse they present a mixed question of law and fact, which a jury alone are competent to solve. I have not looked into the pleadings with reference to this result; but I feel assured that the distinguished counsel for the State would not suffer a case of such importance, and of so much concernment to the community, to go off on a mere question of pleading, and the court would order a resf ondeas ouster if that should be necessary.
The counsel have indulged in speculations as to the unreasonableness of supposing that the Legislature would incorporate a bank with the privilege, express or understood, of not paying their bills in specie. I refer to the Act incorporating the Bank of the State of South Carolina, 8 Stat. at Large, 24, where it will be found that its capital consisted entirely of public stocks, and the pledge of the State to support the bank, without a dollar of specie. That, however, was at a momentous crisis, when all the banks in the Union were suspended, and was no doubt justifiable. But with .the policy of a contract made with the State, the court have nothing to do. All that is expected, all that the court can do, is to declare the law of the contract. The State, whilst she exacts only the reasonable performance of the obligations to her, never repudiates her own.
There are others who think, and perhaps justly, and I confess I am strongly inclined to the opinion, that the world would have got on in the end as well without the aid of chartered banking institutions, and that all the legitimate objects of their institution might as well have been obtained by the means of personal credit or private institutions. The fact cannot, how-. *548 ever, be disguised, that under the stimulating influence of a superabundant quasi currency — and whether substantial or not, is immaterial to- the question — all the departments of agriculture, commerce and manufactures, of science and literature, have been fostered and flourished in the United States to an extent unknown in modern times; and whether the revulsion which is' now felt in the pulse of the body politic, is destined to a collapse more dangerous than the original disease, is yet to be determined. Of one thing, however, I am perfectly assured, that when the rage for banking, which is now rapidly passing away, shall have subsided, no company will be found to accept a charter to be forfeited for suspension of specie payments under all circumstances ; an event which may and must, in all probability, happen; and if what I have not already said, does not demonstrate it, I refer with confidence to the learned and able report of the late Mr. Stephen Elliot, the first President of the Bank of the State of South Carolina, to the Legislature, in 18 — , re-published by the order of the Legislature, and bound up with the Acts of 1840, in whidi be concludes that emergencies may and must arise, in which suspension is inevitable; and to the no less able report of his successor, the late Judge Colcock, with whom I was long associated on the Bench, to the Legislature, justifying the suspension' of that and all the other banks of the State, in 1837, as forced upon them by circumstances over which they had no control. And that is responded to with an approving voice by the report of the committee of Ways and Means, in the resolutions of the session of the Legislature, in 1837. And yet that very act is charged against this bank as a damning sin, a sin not to be justified, palliated or forgiven!
I am of opinion, therefore, that the judgment of the circuit court ought to be affirmed.